

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

|  |  |
|---|---|
| JAMES L. WOOTEN, JR.,<br><br>*Plaintiff,*<br><br>v.<br><br>MARTIN J. GRUENBERG,<br>Chairman, Federal Deposit Insurance Corp.,<br><br>*Defendant.* | Civil Action No. 1:15-cv-724 |

**MEMORANDUM OPINION**

This matter comes before the Court on Defendant's Motion for Summary Judgment. Dkt. 30. The Motion has been fully briefed and the Court held a hearing on the Motion on Friday, April 1, 2016. For the reasons outlined below, the Court finds good cause to GRANT the Motion for Summary Judgment.

### I.   Background

Plaintiff James L. Wooten, Jr., is a former employee at the Federal Deposit Insurance Corporation ("FDIC"). Mr. Wooten, an African-American male, claims he was the target of racial discrimination during his time at FDIC and that the FDIC retaliated against him after he lodged an official complaint of racial discrimination with the EEOC.

Wooten worked at FDIC as a Senior Project Manager in the Delivery Management Branch of the Division of Information Technology ("DIT") from August 2009 until he resigned on July 24, 2014. The FDIC hired Wooten as a Senior IT Project Manager. This was a non-supervisory CG-15 position. A Senior IT Project Manager is expected to have both technical expertise and managerial skills. In this position, Wooten was assigned to specific projects or

1

programs and was tasked with maintaining budgets and schedules, producing expense reports, performing risk management activities, and handling contract administrative duties.

Wooten's supervisors evaluated Wooten's work performance throughout his time at the FDIC. The FDIC utilizes a five-tier rating system to evaluate an employee's performance in several key areas. For Wooten, these job standards were "manages relationships," "manages projects," "communicates in writing and orally," and "applies technical and analytical skills." The five tiers used in this system are: 5—role model; 4—performance leader; 3—accomplished practitioner; 2—improvement required; and 1—unacceptable. The FDIC also uses a three-tier rating system to assess an employee's "behavioral standards." The behavioral standards assessed were "judgment," "flexibility," "teamwork and collaboration," and "accountability for performance." An employee's behavioral standards are assessed as: above target, at target, or below target. Finally, the FDIC uses a rating of I to V to assess an employee's "overall performance." If an employee's performance is found to be unacceptable, the FDIC is required to give that individual an opportunity to improve their performance through a Performance Improvement Plan ("PIP").

### A. Wooten's Work on IMAC

Wooten worked on three major projects while at the FDIC.[1] First, from 2010 until April of 2013, Wooten was a co-program manager on the Information Management and Compliance ("IMAC") program. IMAC was an initiative aimed at developing policies, processes, and procedures for information governance and eDiscovery best practices. Robert Snow, a lawyer in the FDIC's Litigation Information Technology Unit was Mr. Wooten's co-program manager

---

[1] Wooten worked on IMAC, IAMS, and the Identity Credential Access Management ("ICAM") project during his time at the FDIC. Wooten was reassigned to ICAM for only a few months at some point during 2013. The parties do not directly or clearly discuss Wooten's work on ICAM, so this memorandum focuses only on Wooten's work on IMAC and IAMS.

2

within IMAC. Mark Brenneman was the "executive project sponsor" for IMAC. Together, Brenneman, Wooten, and Snow were responsible for leading and supervising IMAC subprojects and preparing reports on these projects for FDIC's steering committee and executive board.

When Wooten started at the FDIC until May of 2012, Ronald Pferchy was his first-level supervisor. Wooten's first annual review assessed his performance from January of 2011 until December of 2011. In this review, Pferchy gave Wooten an "overall performance rating" of II. Pferchy also gave Wooten a 2—needs improvement—for "manages relationships" and assessed Wooten's "judgment" and "accountability for performance" as below target. Pferchy contacted FDIC's Human Resources Labor and Employee Relations Section for advice about how to handle Wooten's poor performance.

In March of 2012, Pferchy conducted a mid-year review of Wooten's performance. In 2012, the FDIC shifted the rating period from the calendar year, January through December, to the fiscal year, September through August. On this new schedule, March was the appropriate time to conduct a mid-year review. Pferchy again assigned Wooten's overall performance a II.

In May of 2012, Gregg Aldana became Wooten's first-level supervisor. At this time, Pferchy, Aldana, and Wooten met to discuss Wooten's poor mid-year performance evaluation.

In August of 2012, Aldana conducted an annual review of Wooten's performance. Aldana assigned Wooten's overall performance a III—accomplished practitioner—because he had seen some improvement in Wooten's performance since the March 2012 mid-year review.

Aldana met with Wooten again in April of 2013 for his next mid-year review. Aldana discussed the deficiencies in Wooten's performance and ways to improve. However, according to Aldana, Wooten's performance continued to decline. As a consequence, Aldana issued a "Letter of Warning" to Wooten on June 20, 2013. The letter highlighted the fact that Wooten's

3

performance had dropped from a III—accomplished practitioner—to a II—improvement required—for the "manages relationships" and "manages projects" performance standards. The letter also noted that Wooten's performance was below target for the behavioral standards of "judgment," "accountability for performance," and "teamwork." The letter cited specific examples of Wooten's deficient performance including failing to attend planning workshops and failing to actively participate in conversations when he did attend meetings. According to the letter, Wooten also failed to take initiative, failed to communicate with clients and stakeholders, communicated unprofessionally, and took leave without informing the necessary personnel. The letter warned Wooten that a failure to improve would result in him being placed on a PIP.

Wooten disputes the assessment of his performance while he was working as an IMAC Program manager. Wooten worked closely with Robert Snow while he was working on IMAC. Snow has praised Wooten's performance on IMAC on multiple occasions and stated that Wooten was instrumental to the success of IMAC.

### B. Wooten's Work on IAMS

Around March/April of 2013 Wooten was removed from IMAC and transferred to the Identity Access Management System (IAMS) project. Wooten was removed from IMAC because an employee at DIT, Christine Larez, filed an allegation of sexual harassment against him. Wooten was eventually cleared of any wrongdoing. IAMS was a project to modernize the security access to the FDIC's office system. Karen Keats was the executive project sponsor for IAMS.

Wooten's 2013 annual review, which evaluated Wooten's performance from September 2012 until August of 2013, was again exceptionally poor. In this review, Aldana gave Wooten's overall performance a I—unacceptable. He also gave him unacceptable ratings in the

4

performance categories of "manages relationships" and "manages projects," and a below target rating in the behavioral categories of "judgement," "teamwork and collaboration," and "accountability for performance." Karen Keats gave Aldana feedback for this annual review and expressed her opinion that Wooten's work was unacceptable overall. According to Keats, Wooten was disengaged, made little effort to gain a foundational understanding of the project, took no initiative on key project management components and relied heavily on others to do his work.

Aldana and Noreen Padilla met with Wooten to discuss the 2013 performance review. Noreen Padilla had become Wooten's second-level supervisor in December of 2011. Padilla normally would not have joined in such a meeting, but did so to communicate to Wooten the seriousness of such a poor review.

Wooten again disputes the assessment of his performance while working on IAMS. In support of this argument he cites the affidavit of Senior IT Specialist Randy Meyers who worked with Wooten on IAMs. Meyers testified that Wooten "effectively coordinated all aspects of the entire project." However, Meyers also stated that had some frustrations with Wooten, noted that some of his presentations did not go very well and recognized that Wooten "did not have a thorough understanding of the business requirements or the technical environment."

In December of 2013, Wooten filed an informal EEO complaint, claiming that he was discriminated against when he received an "unacceptable" rating on his 2013 performance review. Wooten agreed to attempt to mediate the dispute. A four hour mediation was held on March 13, 2014. Padilla and Wooten attended the mediation, along with several others. Aldana was not in attendance.

## C. *The Performance Improvement Plan*

On January 30, 2014, Wooten was placed on a PIP that was scheduled to last for 90 days. Wooten was notified of the PIP via a letter that listed the performance standards that needed improvement, cited examples of his deficient performance, and outlined an action plan for correcting his performance. The letter also notified Wooten that if he did not improve his performance over the duration of the PIP his termination from the FDIC would be recommended. According to Aldana, he met with Wooten regularly throughout the 90 day PIP to discuss his performance. Aldana documented their weekly discussions and noted the status of Wooten's performance 30, 60, and 90 days into the PIP. Wooten, on the other hand, insists that Aldana frequently postponed or canceled meetings during this period and failed to give him bona fide advice. Wooten also insists that Aldana assigned him impossible tasks and would continually add new and arbitrary requirements to assignments that must be met for the assignment to be considered complete.

While Wooten was on the PIP, on March 24, 2014, he filed a formal complaint with the EEOC, claiming discrimination and reprisal.

Accordingly to Aldana, Wooten failed to improve his performance during the PIP. As a consequence, on June 26, 2014, Aldana gave Wooten a Notice of Proposed Removal for unacceptable performance that listed 47 specific examples of his deficient performance. Shortly thereafter, on June 30, 2014, Wooten amended his EEOC complaint to include a claim of constructive discharge. Noreen Padilla was the official who would make the ultimate decision of whether to remove Wooten. Wooten requested that Padilla recuse herself from being the deciding official on his removal. Wooten had filed his EEO complaint against both Aldana and Padilla and he felt that as a consequence Padilla had a conflict of interest in deciding whether to

terminate him. Padilla declined Wooten's request and insists that she did not know that Wooten had filed an EEO complaint. Wooten was informed that he could respond to the proposed removal either orally or in writing within 10 days of the receipt of the proposal. Instead, Wooten resigned from the FDIC on July 24, 2014.

The FDIC issued a final agency decision on the incident on May 8, 2015. The FDIC found that Wooten was not constructively discharged based on his race or reprisal when he resigned.

On June 8, 2015, Mr. Wooten filed a two count Complaint in this Court. In Count I, Mr. Wooten alleges race discrimination. In Count II, Mr. Wooten alleges retaliation for filing an EEO claim. In addition to the specific circumstances he faced, Wooten insists that African-Americans were generally discriminated against at the FDIC and, specifically, were discriminated against by Aldana and Padilla. Wooten seeks to rely on testimony that Aldana refused to promote African-Americans while hiring and promoting white employees that were equally or less qualified. Wooten also seeks to rely on the fact that the only other employee that Aldana has proposed the removal of, Thomas Thornton, was also African-American.

## II.     Legal Standard

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). As the Supreme Court has explained, "this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). A dispute over an issue of material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. Finally, in making a summary judgment determination, the Court must bear in mind that "[a] complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

### III. Discussion

#### A. Count I: Race Discrimination

Wooten's first claim asserts race discrimination in violation of Title VII of the Civil Rights Act of 1964. Title VII prohibits an employer from "discharg[ing] any individual, or otherwise . . . discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C.A. § 2000e–2(a). There are two ways that an employment discrimination plaintiff may defeat a motion for summary judgment and establish a claim for race discrimination. *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 213 (4th Cir. 2007). First, a plaintiff may demonstrate, through direct or circumstantial evidence, that her race was a motivating factor in the employer's adverse employment action. *Id.* (citations omitted). Second, a plaintiff may proceed under the "pretext" framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Id.* Wooten seeks to demonstrate race discrimination through the second of these two methods. Under this burden shifting framework, a plaintiff first has the burden of establishing a prima facie case of race discrimination. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142-43 (2000). If the plaintiff successfully establishes a prima facie case, the burden then shifts to the defendant employer to articulate a legitimate, nondiscriminatory reason for the

employment action. *Id.* If the employer meets this burden of production, the burden shifts back to the plaintiff to show that the reasons offered by the defendant employer are pretext for discrimination. *Id.*

### 1. Prima Facie Case of Race Discrimination

In order to establish a prima facie case of race discrimination, a plaintiff must show that "(1) 'he belongs to a protected class;' (2) 'he suffered an adverse employment action;' (3) 'at the time of the adverse action, he was performing his job at a level that met employer's legitimate expectations;' and (4) the adverse employment action occurred under circumstances giving rise to an inference of unlawful discrimination." *Jones v. Constellation Energy Projects & Servs. Grp., Inc.*, __ Fed. App'x __, 2015 WL 6389167, at *1 (4th Cir. Oct. 22, 2015) (quoting *Adams v. Trs. of the Univ. of N.C.–Wilmington*, 640 F.3d 550, 558 (4th Cir. 2011)); *see also Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252–53 (1981). It is undisputed that Wooten is a member of a protected class. However, Defendant contests the second, third, and fourth elements of Wooten's prima facie case.

#### a. Whether Wooten Suffered an Adverse Employment Action

The adverse employment action requirement "seeks to differentiate those harms that work a significant detriment on employees from those that are relatively insubstantial or trivial." *Adams v. Anne Arundel Cty. Pub. Sch.*, 789 F.3d 422, 431 (4th Cir. 2015). An adverse employment action is an action "that 'constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 337 (4th Cir. 2011) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)). Wooten points to three incidents which he maintains are "adverse employment actions": first,

Aldana's decision to assign Wooten's overall performance a I—unacceptable—on his 2013 annual review; second, Aldana's decision to place Wooten on a PIP; and third, Aldana's proposed removal of Wooten.

"[A] poor performance evaluation is actionable only where the employer subsequently uses the evaluation as a basis to detrimentally alter the terms or conditions of the recipient's employment." *James v. Booz–Allen & Hamilton, Inc.*, 368 F.3d 371, 377 (4th Cir. 2004) (internal quotation marks omitted). Similarly, "where an employee's failure to meet the performance objectives of probation establishes grounds for dismissal, placing an employee on probation may also be an adverse employment action." *Spriggs v. Senior Servs. of Se. Virginia*, 2012 WL 1940761, at *7 (E.D. Va. May 29, 2012) *aff'd sub nom. Spriggs v. Sr. Serv. of Se. Va.*, 489 F. App'x 711 (4th Cir. 2012)). In contrast, "[a]n evaluation merely causing a loss of prestige or status is not actionable." *James*, 368 F.3d at 377.

Neither the poor performance evaluation nor the PIP themselves directly resulted in a detrimental alteration of the conditions of Wooten's employment. Wooten was placed on the PIP in part because of the unacceptable rating on his 2013 performance review. However, when on the PIP, the conditions of Wooten's employment were not altered. Wooten maintained the same position, grade, and salary while on the PIP. Further, while he may have had several additional tasks and meetings while on the PIP, this does not amount to a detrimental effect on his employment and is consistent with the purpose of a performance improvement plan. *See Jensen-Graf v. Chesapeake Employers' Ins. Co.*, 616 F. App'x 596 (4th Cir. 2015) (holding that employer did not take adverse employment action against employee when it placed her on a PIP, even though additional requirements were placed on her as result of PIP, and she incurred additional commuting expenses).

Nevertheless, the poor performance evaluation and the PIP may still be actionable if Defendant used them "as a basis to detrimentally alter the terms or conditions of [Wooten's] employment." *James*, 368 F.3d at 377. Aldana did cite Wooten's failure to improve while on the PIP in his proposal to remove Wooten. However, the proposed removal also did not alter the conditions of Wooten's employment because he was never actually terminated. While the proposal to terminate was pending, Wooten kept the same position, grade, and salary and the proposal to remove was never acted on because Wooten chose to resign. Plaintiff has not cited a case that holds that a proposal to terminate alone constitutes an adverse employment action. Defendant, on the other hand, cites *Boykin v. England*, in which the United States District Court for the District of Columbia concluded that a "Notice of Proposed Removal" was not an adverse employment action, but rather was an "interlocutory or mediate decision" that did not itself result in tangible harm and was thus not separately actionable. *Boykin v. England*, 2003 WL 21788953, at *5 (D.D.C. July 16, 2003). In coming to this conclusion, *Boykin* relied on the Fourth Circuit's decision in *Page v. Bolger*, 645 F.2d 227 (4th Cir. 1981). *Page* emphasized that "there are many interlocutory or mediate decisions having no immediate effect upon employment conditions which were not intended to fall within the direct proscriptions of . . . Title VII . . . that are simply steps in a process for making such obvious end decisions as those to hire, to promote etc." *Id.* at 233. Following *Boykin*'s application of *Page*, the Court concludes that the proposed removal was not an adverse employment action.

Because the proposed removal was not an adverse employment action, neither was the poor performance review nor the PIP. This case is very similar to *Spriggs v. Senior Servs. of Se. Virginia*, 2012 WL 1940761, at *6 (E.D. Va. May 29, 2012) *aff'd sub nom. Spriggs v. Sr. Serv. of Se. Va.*, 489 F. App'x 711 (4th Cir. 2012). In *Spriggs*, the plaintiff claimed she suffered

adverse employment actions when (1) she received a poor performance evaluation, (2) she was placed on probation, and (3) she was reassigned to a new position with a different job title and less responsibility. *Id.* The *Spriggs* court concluded that the performance evaluation and probation were both adverse employment actions because the employer relied on both to reassign the plaintiff to a lesser position. *Id.* at *7. Imperative to this determination was the conclusion that the plaintiff did ultimately experience a significant change in employment status when she was reassigned to a lesser position. Here that is not the case because Defendant never changed the conditions of Wooten's employment. Rather, Wooten changed his employment status when he chose to resign. Because Defendant never altered the conditions of Wooten's employment, the Court must conclude that none of the three acts Wooten complains of constitute an adverse employment action.

### b. Whether Wooten's Work Performance Was Sufficient

To satisfy the third element of a prima facie case, Wooten must present evidence that his performance was meeting Defendant's legitimate job expectations. *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 515 (4th Cir. 2006). The record shows that Wooten struggled with performance issues since he began working at the FDIC. In his very first performance review, conducted by Ronald Pferchy, Wooten received a II—needs improvement—for his overall performance. Wooten only once received a performance review greater than needs improvement. Otherwise, as extensively documented by Defendant, Wooten's performance remained subpar throughout his time at the FDIC. Eventually, Wooten's poor performance triggered a mandatory PIP. Aldana drafted a PIP memorandum which in detail explained Wooten's deficiencies and ways in which he needed to improve. Throughout the PIP, Aldana met with Wooten multiple times a month and provided monthly written updates explaining how his performance continued to fall

below expectations. Padilla reviewed Aldana's assessments to make sure they were factually supported. Both Aldana and Padilla received input from other managers, such as Keats, the executive project sponsor of IAMS, that supported the conclusion that Wooten's work was unacceptable. The evidence shows that throughout his time at the FDIC, Wooten struggled to manage his projects and his relationships with clients and co-workers. He appeared disengaged or disinterested at meetings when he actually attended them. He scheduled important meetings when he knew he would be out of the office. He failed to gain the necessary technical understanding of his project and as a result relied on others to do much of his work for him.

In response, Wooten presents the testimony of two of his co-workers. First, he presented the testimony of Robert Snow, a lawyer in the FDIC's Litigation Information Technology Unit, and Wooten's co-program manager within IMAC. Snow has stated that he worked closely with Wooten on IMAC and that he thought Wooten did a tremendous job. Wooten insists that Snow is a reliable witness because he is not vulnerable to retaliation by Aldana and Padilla because he does not work in DIT.

Snow's assessment of Wooten's performance is of little consequence. First, Snow can only speak to Wooten's work on IMAC, which occurred more than a year before Wooten was fired. Wooten's unacceptable performance rating and PIP came while Wooten was working on IAMS. Second, the relevant inquiry is whether the "decision maker" thought Wooten was meeting job expectations at the time of the adverse employment action. *King v. Rumsfeld*, 328 F.3d 145, 149 (4th Cir. 2003); *Smith v. Flax*, 618 F.2d 1062, 1067 (4th Cir. 1980) ("It is the perception of the decision maker which is relevant."). The "fact testimony" of Wooten's co-workers "cannot establish a genuine issue as to whether [Wooten] was meeting [Defendant's expectations." *King*, 328 F.3d at 149. Wooten could present co-workers as expert witnesses

qualified "to testify as to their employer's legitimate job performance expectations and as to their own analysis and evaluation of the plaintiff's performance in light of those expectations." *Id.* at 150. However, Wooten has not proffered his co-workers in this capacity.

Wooten also presents the testimony of Randy Meyers, who stated that Wooten did an adequate job on the IAMS project. Meyers also testified that Wooten's white replacement performed this job at the same level of effectiveness as Wooten. Meyers' testimony is also inapposite as Meyers was neither a "decision maker" nor presented as an expert witness. Further, Meyers himself stated that Wooten struggled with certain aspects of his work. For example, he stated that Wooten "did not have a thorough understanding of the business requirements or technical environment;" some of his presentations did not go smoothly because "he had trouble conveying the technical value of [a] very technical system," and he often asked for feedback on draft presentations but ultimately he incorporated little or none of the feedback that was given.

Even if the Court could rely on this evidence, the testimony of these two co-workers does very little to combat the extensive documentation presented by the Defendant that clearly shows Wooten's work was not meeting expectations for several years. Considering the evidence before the Court, no reasonable jury could conclude that Wooten was performing his job satisfactorily. Accordingly, the Court concludes that Wooten has not satisfied this element of his prima facie case.

### c. *Inference of Unlawful Discrimination*

Fourth and finally, Wooten has the burden of establishing that the adverse employment actions he complains of occurred under circumstances giving rise to an inference of unlawful discrimination. However, because the Court has definitively found that Wooten has failed to

establish two necessary elements of his prima facie case, the Court need not reach this remaining element.

### 2. Remaining Steps in *McDonnell Douglas* Framework

Because Plaintiff has not established his prima facie case of race discrimination the Court finds good cause to grant summary judgment in favor of Defendant on this claim. The Court need not work through the remaining steps of the *McDonnell Douglas* burden-shifting framework to reach this conclusion. However, the Court notes that Defendant has articulated and detailed a legitimate, nondiscriminatory reason for the actions it took against Wooten. The Court will not rehash the evidence at length, but Defendant has extensively documented Wooten's poor work performance that persisted throughout his time at the FDIC. In the year leading up to his resignation, his performance continued to decline. Aldana met with Wooten on many occasions to discuss his performance and gave him written documentation of the substance of these meeting. Aldana placed Wooten on a PIP to give him the opportunity to improve. Aldana also documented their interactions throughout the PIP. Despite this support, Wooten simply failed to improve. Aldana's assessment of Wooten's performance is supported by testimony from other managers within FDIC and Padilla reviewed Aldana's assessments of Wooten's work to ensure that it was factually supported. In sum, Defendant has overwhelmingly established that it took the complained of remedial actions because Wooten's work performance was inadequate.

### B. Count II: Retaliation

Title VII also prohibits employers from discriminating against employees for challenging any employment practice made unlawful by Title VII or for participating in any Title VII investigation. 42 U.S.C.A. § 2000e–3(a). The Fourth Circuit has directed that the *McDonnell*

*Douglas* burden-shifting framework also applies to retaliation claims. *Foster v. Univ. of Maryland-E. Shore*, 787 F.3d 243, 249 (4th Cir. 2015). Thus, a plaintiff first must establish a prima facie retaliation claim. *Id.* However, the Supreme Court recently held that "the lessened causation standard of § 2000e–2(m) does not apply to retaliation claims." *Id.* (explaining *University of Texas Southwestern Medical Center v. Nassar*, — U.S. —, 133 S.Ct. 2517, 186 L.Ed.2d 503 (2013)). Thus, unlike in a claim for racial discrimination, a plaintiff asserting a retaliation claim "must be able to prove that 'the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer.'" *Id.* (quoting *Nassar*, 133 S.Ct. at 2533).

The elements of a prima facie retaliation claim under Title VII are: "(1) engagement in a protected activity; (2) adverse employment action; and (3) a causal link between the protected activity and the employment action." *Coleman v. Maryland Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010) *aff'd sub nom. Coleman v. Court of Appeals of Maryland*, 132 S. Ct. 1327, 182 L. Ed. 2d 296 (2012). Wooten engaged in protected activity on several different occasions. First, in December of 2013, Wooten filed an informal EEO complaint, claiming that he was discriminated against when he received an "unacceptable" rating on his 2013 performance review. Wooten agreed to attempt to mediate the dispute. A mediation was held on March 13, 2014. Padilla and Wooten attended the mediation, along with several others. Aldana was not in attendance. Shortly thereafter Wooten filed a formal EEO complaint. He amended this complaint once, in June of 2014. Defendant challenges the third element, the causal connection between this protected activity and the employment actions.

### 1. Causal Link Between Protected Activity and Employment Action

Wooten alleges that a jury could infer a causal connection between the protected activity and the employment actions based on the fact that Aldana and Padilla knew about the protected activity. The evidence shows that Padilla learned of the informal EEO complaint filed in December of 2013 in late February 2014. There is no evidence, however, that Aldana knew about the informal complaint. In addition, both Aldana and Padilla have stated in sworn affidavits that they did not know about the formal EEO complaint until May of 2014, after Aldana informed Wooten that he had failed the PIP.

Close temporal proximity can support a claim of causation. *See Foster*, 787 F.3d at 253; *King v. Rumsfeld*, 328 F.3d 145, 151 & n. 5 (4th Cir. 2003) (finding that a two-and-a-half month gap between protected activity and an adverse employment action was sufficiently narrow to establish the causation prong of the prima facie case solely on the basis of temporal proximity). However, a plaintiff must prove that the protected activity preceded the adverse action and that the employer knew the employee engaged in a protected activity. *Causey v. Balog*, 162 F.3d 795, 803 (4th Cir. 1998) ("Knowledge of a charge is essential to a retaliation claim."). There is no evidence that either Aldana or Padilla knew about either the informal or formal EEO complaints until after the PIP had already been initiated. Thus, there is no evidence of a causal connection between the protected activity and the PIP.

There is also no evidence that Aldana knew about either EEO complaint until he had told Wooten that he had failed the PIP. Aldana had already previously told Wooten that a failure to pass the PIP could result in his termination and Aldana recommended that Wooten be removed based on his failure to pass the PIP. While Padilla may have learned of the informal complaint in late February, this does little to strengthen the causal connection as Aldana was Wooten's

primary supervisor and was responsible for designing and supervising the PIP. Padilla was a secondary supervisor that reviewed and approved Aldana's work. Aldana alone drafted the proposal to remove Wooten and Padilla had yet to act on the proposal when Wooten resigned.

The Court finds that based on the scant evidence in the record, a reasonable jury would not find the requisite causal connection between Wooten's protected activity and the PIP or Aldana's proposal to remove Wooten. Accordingly, the Court finds that Wooten has not established a prima facie case of retaliation. Because Wooten has failed to even establish a prima facie case of retaliation, the Court finds good cause to grant the Motion for Summary Judgment on this claim.

### 2. Legitimate, Non-Retaliatory Reason for Employment Action

In the second step of the *McDonnell Douglas* burden-shifting framework, Defendant has the opportunity to show it had a legitimate, non-retaliatory reason for its actions. The Court need not reach this issue as it has determined that Wooten has not established its prima facie case. However, the Court reiterates, as described in the analysis of Wooten's race discrimination claim, that Defendant has overwhelmingly met its burden on this point. Wooten's work performance was inadequate and he failed to improve despite receiving extensive feedback and support while on the PIP.

### 3. Pretext

In the final phase of the *McDonnell Douglas* burden shifting framework, Wooten has the opportunity to show that Defendant's proffered reason is pretext for retaliation. This is a high bar in the context of a retaliation claim. In order to carry this burden, Wooten must establish "both that [Defendant's] reason was false and that [retaliation] was the real reason for the challenged conduct." *Foster*, 787 F.3d at 252 (citations and quotations omitted). Again, while

the Court need not reach this point, it finds that Wooten has not established that Defendant's proffered reason is pretext for retaliation. First, as stated above, Wooten's attempts to show that Defendant's reasons for placing him on a PIP and proposing to remove him are false are unavailing. Wooten's work product was clearly not meeting Defendant's standards and the testimony of Wooten's co-workers is insufficient to disprove this point. Second, Wooten has presented no evidence that retaliation is the real reason for Defendant's acts. In the absence of any direct or circumstantial evidence that but-for his EEO complaint Aldana would not have placed him on a PIP or proposed his removal, the Court must conclude that Wooten has failed to carry his burden on this point.

### C. Constructive Discharge

For the reasons stated in Court at the April 1, 2016, hearing, the Court finds good cause to grant the Summary Judgment in Defendant's favor on the constructive discharge claim.

### IV. Conclusion

As outlined above, the Court finds good cause to GRANT the Motion for Summary Judgment. Wooten has failed to establish a prima facie case of racial discrimination or retaliation. Further, Defendant has given a legitimate, nondiscriminatory reason for its actions: Wooten's work performance was inadequate. Defendant has supported this reason with extensive evidence and Wooten has failed to raise an inference that this reason is pretext for discrimination or retaliation. Accordingly, the Court ORDERS that the Motion for Summary Judgment is GRANTED. An appropriate Order will issue.

/s/ *[signature]*
Liam O'Grady
United States District Judge

April 4, 2016
Alexandria, VA